# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### PINE BLUFF DIVISION

**PINE BLUFF SCHOOL DISTRICT**                                                **PLAINTIFF**

**v.**                              **Case No. 5:18-cv-00185-KGB**

**ACE AMERICAN INSURANCE COMPANY**                          **DEFENDANT**

## <u>OPINION AND ORDER</u>

Before the Court is a motion for summary judgment filed by defendant ACE American Insurance Company ("ACE") (Dkt. No. 13). Plaintiff Pine Bluff School District ("PBSD") responded in opposition (Dkt. No. 23), and ACE replied (Dkt. No. 26). PBSD then filed a supplement to response to motion for summary judgment (Dkt. No. 38). For the following reasons, the Court grants the motion for summary judgment (Dkt. No. 13).

## I.     Factual Background

Unless otherwise noted, the following facts are taken from ACE's statement of undisputed material facts in support of ACE's motion for summary judgment and from PBSD's response to statement of undisputed facts (Dkt. Nos. 14, 25). The Court notes that Local Rule 56.1 of the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas provides that all material facts set forth in the statement filed by the moving party shall be deemed admitted unless controverted by the statement filed by the non-moving party. Local Rule 56.1(c). As such, the Court deems admitted each parties' statement of material facts to the extent statements are not controverted by the opposing party.

### A.     The 2015 Policy

ACE issued ACE Scholastic Advantage Educators Legal Liability Policy No. EON G23670471 003 to PBSD for the period April 2, 2015, to February 1, 2016 ("the 2015 Policy")

(Dkt. No. 25, at 1). The Declarations for the 2015 Policy contain a statement in bold and capital letters stating that "**THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD** . . . " (*Id.*) (emphasis in original). The Insuring Agreement for the Employment Practices Liability coverage section in the 2015 Policy provides that "[t]he Insurer will pay on behalf of the Insureds all Damages and Claims Expenses for which the Insured becomes [sic] legally obligated to pay by reason of a Claim first made against an Insured and reported to the Insurer during the Policy Period . . . " (*Id.*, at 1-2).

The 2015 Policy defines "Claim" to include "a civil, administrative or regulatory proceeding against any Insured commenced by . . . the issuance of a notice of charge or formal investigative order, including without limitation any such proceeding by or in association with . . . the Equal Employment Opportunity Commission" (*Id.*, at 2). The 2015 Policy also defines "Claim" to include "a civil proceeding against any Insured seeking monetary Damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading" (*Id.*). Although PBSD admits this language appears in the 2015 Policy, PBSD submits that there are several other subparagraphs setting forth instances which fall within the definition of "Claim" (*Id.*). The Limit of Liability Section for the 2015 Policy provides, in part, "[a]ll Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed to be one Claim. Such Claim shall be deemed to be first made on the date the earliest of such Claim is first made, regardless of whether such date is before or during the Policy Period" (*Id.*, at 2-3).

"Wrongful Acts" are defined in the 2015 Policy to include "Wrongful Employment Practices committed or attempted by the Educational Institution or by any Insured Educator acting

solely in their capacity as such and on behalf of the Educational Institution . . . " (*Id.*, at 3).

"Wrongful Employment Practices" include "1. [W]rongful dismissal, discharge or termination, whether actual or constructive; . . . 3. Discrimination; . . . 4. Sexual Harassment or unlawful workplace harassment; . . . 8. [W]rongful discipline; [and] 9. Retaliation . . . of any past, present[,] or prospective full-time, part-time, seasonal and temporary Employee . . . of the Educational Institution" (*Id.*). Although PBSD admits this language appears in the 2015 Policy, PBSD contends that these are only portions of the defined terms (*Id.*). "Interrelated Wrongful Acts" are defined in the 2015 Policy as "[a]ll Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause of series of related facts, circumstances, situations, events, transactions[,] or causes" (*Id.*).

The Notice Section for the 2015 Policy states that "[t]he Insured shall, as a condition precedent to their rights under this Policy, give to the Insurer written notice of any Claim as soon as practicable, but in no event later than 30 days after: 1. The end of the Policy Period . . . " (*Id.*, at 3-4). Although PBSD admits this language appears in the 2015 Policy, PBSD submits that this is only a portion of the "Notice" section (*Id.*, at 4). Endorsement 4 to the 2015 Policy amends the Notice provision "by deleting the phrase '30 days' and inserting the phrase '60 days'" (*Id.*).

ACE contends that the 2015 Policy includes the following definition for "Policy Period": "The period of time specified in Item 2 of the Declarations, subject to prior termination pursuant to Section VIX, Termination of the Policy" (Dkt. No 14, ¶ 9). PBSD denies that the definition of "Policy Period" refers to Section VIX and submits that it actually refers to Section XIV (Dkt. No. 25, at 4). Item 2 of the Declarations identifies the Policy Period for the 2015 Policy as spanning "From 12:01 a.m. 04/02/2015 To 12:01 a.m. 02/01/2016" (*Id.*, at 4-5).

### B.    The 2016 Policy

ACE issued Ace Scholastic Advantage Educators Legal Liability Policy No. EON G23670471 004 to PBSD for the period February 1, 2016, to February 1, 2017 ("the 2016 Policy") (*Id.*, at 5).  The Declarations for the 2016 Policy contain a statement in bold and capital letters stating that "**THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY.  EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD** . . . " (*Id.*) (emphasis in original).  The Insuring Agreement for the Employment Practices Liability coverage section in the 2016 Policy provides that "[t]he Insurer will pay on behalf of the Insureds all Damages and Claims Expenses for which the Insured becomes [sic] legally obligated to pay by reason of a Claim first made against an Insured and reported to the Insurer during the Policy Period . . . " (*Id.*).

The 2016 Policy defines "Claim" to include "a civil, administrative or regulatory proceeding against any Insured commenced by . . . the issuance of a notice of charge or formal investigative order, including without limitation any such proceeding by or in association with . . . the Equal Employment Opportunity Commission" (*Id.*, at 5-6).  The 2016 Policy also defines "Claim" to include "a civil proceeding against any Insured seeking monetary Damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading" (*Id.*, at 6).  Although PBSD admits this language appears in the 2016 Policy, PBSD submits that there are several other subparagraphs setting forth instances which fall within the definition of "Claim" (*Id.*).  The Limit of Liability Section for the 2016 Policy provides, in part, "[a]ll Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts of the Insureds shall be deemed to

be one Claim. Such Claim shall be deemed to be first made on the date the earliest of such Claim is first made, regardless of whether such date is before or during the Policy Period" (*Id.*, at 6).

"Wrongful Acts" are defined in the 2016 Policy to include "Wrongful Employment Practices committed or attempted by the Educational Institution or by any Insured Educator acting solely in their capacity as such and on behalf of the Educational Institution . . . " (*Id.*, at 6). "Wrongful Employment Practices" include "1. [W]rongful dismissal, discharge or termination, whether actual or constructive; . . . 3. Discrimination; . . . 4. Sexual Harassment or unlawful workplace harassment; . . . 8. [W]rongful discipline; [and] 9. Retaliation . . . of any past, present[,] or prospective full-time, part-time, seasonal and temporary Employee . . . of the Educational Institution" (*Id.*, at 7). Although PBSD admits this language appears in the 2016 Policy, PBSD contends that these are only portions of the defined terms (*Id.*). "Interrelated Wrongful Acts" are defined in the 2016 Policy as "[a]ll Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause of series of related facts, circumstances, situations, events, transactions[,] or causes" (*Id.*).

ACE contends that the 2016 Policy includes the following definition for "Policy Period": "The period of time specified in Item 2 of the Declarations, subject to prior termination pursuant to Section VIX, Termination of the Policy" (Dkt. No 14, ¶ 17). PBSD denies that the definition of "Policy Period" refers to Section VIX and submits that it actually refers to Section XIV (Dkt. No. 25, at 7). Item 2 of the Declarations identifies the Policy Period for the 2016 Policy as spanning "From 12:01 a.m. 02/01/2016 To 12:01 a.m. 02/01/2017" (*Id.*, at 8).

## C. Celeste Alexander's Sexual Harassment Claim

Celeste Alexander was a math teacher at Pine Bluff High School during the 2014-2015 school year (*Id.*). Michael Nellums was the principal of Pine Bluff High School and was Ms.

Alexander's supervisor (*Id.*). Ms. Alexander alleged in a lawsuit she filed against PBSD on September 22, 2016, that Mr. Nellums began sexually harassing her in or around November 2014 (*Id.*). She alleged that Mr. Nellums retaliated against her after she rejected his advances by calling her to meetings where no one was present; ignoring her emails; improperly scrutinizing her work; and falsely accusing her of unprofessional conduct (*Id.*). Ms. Alexander was notified in April 2015 that she was one of several teachers terminated in a reduction of force. In her complaint against PBSD, Ms. Alexander alleged that her termination and failure to be rehired were in retaliation for her reaction to Mr. Nellums' alleged sexual harassment (*Id.*). Ms. Alexander alleged in her complaint that she reported the alleged sexual harassment to PBSD on or around June 3, 2015 (*Id.*, at 8-9). PBSD admits that Ms. Alexander alleged these matters in her lawsuit but does not admit the accuracy of the allegations in the underlying case (*Id.*, at 9).

Ms. Alexander filed a charge of discrimination, Charge No. 493-2016-00340, with the Equal Employment Opportunity Commission ("EEOC") on December 1, 2015 (*Id.*). Her charge lists PBSD as "the Employer . . . That I Believe Discriminated Against Me or Others" (*Id.*). In her charge, Ms. Alexander marked a box indicating that her discrimination was based on "Retaliation" (*Id.*). PBSD admits that these allegations were included in the charge of discrimination but denies that the allegations were accurate (*Id.*).

Ms. Alexander alleged in her EEOC charge: "I was hired September 19, 2014, as a [m]ath [l]ab [c]oordinator/[m]ath [t]eacher. I was identified for [reduction in force] in April 2015. I filed a sexual harassment complaint against my [p]rincipal in June 2015. I was not hired for the next school year and my employer hired uncertified and lesser-qualified math teachers in August 2015. I was told that I would never be rehired for making false allegations. I believe I was not rehired in retaliation for filing sexual harassment allegations in violation of Title VII of the Civil Rights

Act of 1964, as amended" (*Id.*, at 9-10). PBSD admits that Ms. Alexander made these allegations in her charge of discrimination but denies that her allegations were accurate (*Id.*, at 10).

PBSD received the December 1, 2015, EEOC charge and filed a response and provided documents to the EEOC (*Id.*, at 10). PBSD submitted a mediation statement to the EEOC on January 21, 2016, and it submitted a position statement to the EEOC on January 28, 2016 (*Id.*). On January 29, 2016, PBSD submitted written responses and documents in response to 18 inquiries and requests for documentation that the EEOC requested from PBSD (*Id.*). The EEOC issued a dismissal and notice of rights on June 24, 2016 (*Id.*). The EEOC's right to sue letter gave Ms. Alexander 90 days from her receipt of the notice of rights to file suit (*Id.*).

Ms. Alexander filed a complaint for damages against PBSD and Mr. Nellums in the United States District Court for the Eastern District of Arkansas on September 22, 2016, Case No. 5:16-cv-00300-BSM (*Id.*). Ms. Alexander alleged that she "timely filed a charge of discrimination against [PBSD] with the EEOC" and that her lawsuit was "commenced within [90] days of receipt of the '[n]otice of [r]ight to [s]ue'" (*Id.*, at 10-11). The complaint alleged that Ms. Alexander "was not called back from the ROF or rehired[] because of her complaints of sexual harassment" and that "[o]ther teachers were hired . . . despite being lesser qualified that [Ms.] Alexander in violation of [PBSD's] [r]eduction of [f]orce [p]olicies" (*Id.*, at 11). PBSD admits that these allegations were made but denies that the allegations were accurate (*Id.*).

Ms. Alexander's December 1, 2015, EEOC charge is a "Claim" as defined in the ACE Policies as: "a civil, administrative or regulatory proceeding against any Insured commenced by . . . the issuance of a notice of charge or formal investigative order, including without limitation any such proceeding by or in association with . . . the [EEOC]" (*Id.*). Ms. Alexander's September 22, 2016, complaint for damages is a "Claim" as defined in the ACE Policies as: "a civil proceeding

against any Insured seeking monetary Damages or non-monetary or injunctive relief, commenced by the service of a complaint . . . " (*Id.*, at 11-12). The December 1, 2015, EEOC charge and PBSD's responses to the EEOC on January 26, 2016, January 28, 2016, and January 29, 2016, all occurred during the 2015 Policy period between April 2, 2015, and February 1, 2016 (*Id.*, at 12).

### D.    PBSD's Demand For Insurance Coverage From ACE

PBSD first reported Ms. Alexander's Claim (her lawsuit) to ACE on October 3, 2016 (*Id.*). PBSD's insurance agent attached to the loss notice a copy of the lawsuit and an email from PBSD's counsel (*Id.*). The email states that "[t]here was a related EEOC claim and investigation by the Arkansas Department of Education Professional Licensure Standards Board, which dismissed the allegations. The EEOC issued a right to sue letter on June 24, 2016" (*Id.*). ACE acknowledged receipt of Ms. Alexander's Claim and sent an email to PBSD's superintendent, Dr. Michael Robinson, on October 20, 2016 (*Id.*). ACE requested that PBSD provide "a copy of the EEOC charge filed against Ms. Alexander," along with "any documents relating to the [June 2015] grievance process" (*Id.*, at 12-13).

ACE sent PBSD a letter on October 25, 2016, requesting that PBSD provide ACE with "(i) a copy of the charge filed by [Ms.] Alexander with the U.S. Equal Employment Opportunity Commission ("EEOC") and (ii) a copy of any written demands, complaints, grievances, etc., from [Ms.] Alexander received by the Insured prior to the EEOC charge and lawsuit" (*Id.*, at 13). The October 25, 2016, ACE letter states that ACE "reserves the right to amend and/or deny coverage based on review of this information" (*Id.*). ACE's October 25, 2016, letter states that it reserves "the right to withdraw the defense provided in this matter and the right . . . to address additional coverage issues as they may arise, based upon the Policy and/or additional facts that may come to [ACE's] attention" (*Id.*). ACE also stated in the letter that "[n]othing contained in this letter, and

no action on [ACE's] part in investigating these matters, should be construed as an admission of coverage or as a waiver of any right, remedy or defense that may be available to [ACE]" (*Id.*). PBSD admits the language was included in the October 25, 2016, letter. ACE contends that the letter constituted a complete reservation of rights, and PBSD denies the characterization that this language "constituted a complete reservation of rights" (*Id.*).

ACE submits that PBSD first provided the EEOC charge to ACE on November 22, 2017 (Dkt. No. 14, ¶ 34). PBSD admits that the EEOC charge appears to have been sent to ACE on November 22, 2017, by PBSD's counsel, but PBSD denies this statement to the extent that it suggests that PBSD was not diligent in sending this document earlier (Dkt. No. 25, at 14). Further, PBSD denies the statement to the extent that it suggests that ACE demonstrated sufficient diligence in obtaining the document and to the extent that the statement suggests that ACE was not already in possession of certain information regarding the EEOC charge which could have led it to make its coverage decision earlier (*Id.*).

On February 14, 2018, ACE issued a supplemental coverage position (*Id.*). ACE submits that it did so based on its discovery that the December 1, 2015, EEOC charge and PBSD's responses to the EEOC on January 26, 2016, January 28, 2016, and January 29, 2016, all occurred during the 2015 Policy period from April 2, 2015, to February 1, 2016 (Dkt. No. 14, ¶ 35). PBSD denies that the relevant information was "discover[ed]" by ACE immediately prior to the February 14, 2018, letter, because PBSD contends that some information regarding the EEOC claim was already in ACE's possession (Dkt. No. 25, at 14-15). ACE advised PBSD in the February 14, 2018, letter that there "is no coverage under the [2015] Policy" because ACE "was first provided with notice of this matter on October 3, 2016, more than 60 days after the end of the [2015] Policy" (*Id.*, at 15). ACE also advised PBSD in the letter that "coverage for this matter is precluded in its

entirety" under the 2016 Policy because "the Claim in this matter is considered made . . . prior to the policy period of February 1, 2016, to February 1, 2017" (*Id.*). PBSD admits that the February 14, 2018, letter makes these statements but does not admit that the determinations in the letter were proper or correct under these circumstances (*Id.*).

PBSD settled Ms. Alexander's claim in March 2018 for $50,000.00, and Ms. Alexander was awarded prevailing party fees pursuant to the terms of the settlement (*Id.*). On August 30, 2018, the Court presiding over Ms. Alexander's lawsuit entered an order awarding Ms. Alexander $100,000.00 in attorneys' fees and $19,367.37 in costs (*Id.*, at 15-16). PBSD does not dispute these allegations and adds that the August 30, 2018, Order in the underlying case also states that Ms. Alexander's settlement also included a $7,000.00 payment to her retirement account and reemployment with the school district (*Id.*, at 16).

PBSD filed this lawsuit against ACE on June 1, 2018 (*Id.*). ACE submits that PBSD demands payment of the $50,000.00 settlement, the $119,367,37 prevailing party award, and $82,425.22 in Claims Expenses that PBSD incurred defending against Ms. Alexander's lawsuit (Dkt. No. 14, ¶ 39). PBSD admits that it is seeking those damages but denies the statement to the extent that the statement attempts to limit the characterization of damages sought by PBSD (Dkt. No. 25, at 16). PBSD submits that its complaint was broader in its damages claims and that the complaint stated:

> [PBSD] asks for an award of damages for all of the expenses paid by [PBSD] arising from the [f]ederal [c]ourt litigation including, but not limited to, attorneys' fees expended, costs, paid by [PBSD], together with a [d]eclaratory [j]udgment that there is coverage from [ACE] to [PBSD] under these circumstances together with a 12% penalty in attorneys' fees and any all other expenses incurred by [PBSD] in the defense of the underlying case including, but not limited to, the settlement amount reached with [Ms. Alexander] in the underlying case [], together with any award of attorneys' fees by the [f]ederal [c]ourt to the attorney for [Ms.] Alexander, together with any and all other expenses incurred and/or sustained by [PBSD] arising from this incident.

(*Id.*, at 16-17).

## II. Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact in dispute and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. Discussion

PBSD seeks a declaratory judgment that there is coverage from ACE in favor of PBSD for the underlying lawsuit filed by Ms. Alexander and damages against ACE (Dkt. No. 2, ¶ 17). PBSD asserts in the alternative that ACE has waived any and all alleged defenses to coverage and that ACE is estopped from claiming no coverage (*Id.*, ¶¶ 23, 25). ACE contends that it denied coverage for Ms. Alexander's lawsuit because PBSD did not meet the reporting requirements for either of

two separate ACE "claims-made and reported" policies, which ACE contends are conditions precedent to coverage under those policies (Dkt. No. 15, at 1). ACE moves for summary judgment (Dkt. No. 13).

## A. Applicable Arkansas Law

"State law governs the interpretations of insurance policies where federal jurisdiction is based on diversity of citizenship." *Secura Ins. v. Horizon Plumbing, Inc.*, 670 F.3d 857, 861 (8th Cir. 2012). The 2015 and 2016 Policies at issue in this case include an Arkansas Amendatory Endorsement but do not include a specific choice of law provision (Dkt. No. 13-1; Dkt. No. 13-2). In their papers to the Court, the parties both cite Arkansas law to support their arguments (Dkt. Nos. 15, 24). *See Kaufmann v. Siemens Medical Solutions, USA, Inc.*, 638 F.3d 840, 843 (8th Cir. 2011) ("Our subject matter jurisdiction in this case is based upon diversity of citizenship, and the parties agree that Iowa law governs our analysis.") (citing *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 499 (8th Cir. 2010)). Accordingly, the Court will apply Arkansas law to the dispute.

Arkansas law "regarding the construction of an insurance contract is well settled." *Norris v. State Farm Fire & Cas. Co.*, 16 S.W.3d 242, 244 (Ark. 2000). "The language in an insurance policy is to be construed in its plain, ordinary, popular sense." *Id.* (citing *CNA Ins. Co. v. McGinnis*, 666 S.W.2d 689, 691 (Ark. 1984)). "Exclusionary endorsements must adhere to the general requirements that the insurance terms must be expressed in clear and unambiguous language." *Castaneda v. Progressive Classic Ins. Co.*, 166 S.W.3d 556, 560 (Ark. 2004) (citing *Norris*, 16 S.W.2d at 242). "If the language of the policy is unambiguous," then the Court must "give effect to the plain language of the policy without resorting to the rules of construction." *Id.* (citing *Elam v. First Unum Life Ins. Co.*, 57 S.W.3d 165, 169 (Ark. 2001)). Alternatively, if the

language of the policy is ambiguous, the Court must "construe the policy liberally in favor of the insured and strictly against the insurer." *Id.* (citing *Elam*, 57 S.W.3d at 169). "The terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing it so as to bind the insurer to a risk which is plainly excluded and for which it was not paid." *Castaneda*, 166 S.W.3d at 561 (citing *Southern Farm Bureau Casualty Ins. Co. v. Williams*, 543 S.W.2d 467 (Ark. 1976)).

"Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation." *Id.* (citing *Harasyn v. St. Paul Guardian Ins. Co.*, 75 S.W.3d 696, 701 (Ark. 2002)). Whether an insurance policy is ambiguous is a question of law to be resolved by the Court. *Id.* Although the meaning of an ambiguity may become a question for the fact-finder if parole evidence has been admitted to resolve that ambiguity, *see Minerva Enterprises, Inc. v. Bituminous Casualty Corp.,* 851 S.W.2d 403 (Ark. 1993), "where the meaning of the language of a written contract does not depend on disputed extrinsic evidence, the construction and legal effect of the contract are questions of law." *Smith v. Prudential Prop. & Cas. Ins. Co.*, 10 S.W.3d 846, 850 (Ark. 2000) (citing *Duvall v. Massachusetts Indem. & Life Ins. Co.,* 748 S.W.2d 650 (Ark. 1988); *Security Ins. Co. v. Owen,* 480 S.W.2d 558 (Ark. 1972)).

**B.    Relevant Policy Language**

The 2015 and 2016 Policies contain the following Declarations provision:

**THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY.  EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.  AMOUNTS INCURRED FOR DAMAGES AND CLAIMS EXPENSES SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.    PLEASE READ THIS POLICY CAREFULLY.**

(Dkt. No. 13-1, at 1; Dkt. No. 13-2, at 1) (emphasis in originals).

The 2015 Policy Period spanned from 12:01 a.m. on April 2, 2015, to 12:01 a.m. on February 1, 2016 (Dkt. No. 13-1, at 1). The 2016 Policy Period spanned from 12:01 a.m. on February 1, 2016, to 12:01 a.m. on February 1, 2017 (Dkt. No. 13-2, at 1). The 2015 and 2016 Policies indicate that "[f]or coverage . . . [t]he **Insured** shall, as a condition precedent to their rights under this **Policy**, give to the **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than 30 days after . . . the end of the **Policy Period** or . . . with respect to **Claims** first made during any applicable Automatic or Optional **Extended Reporting Period**, the end of such Automatic or Optional **Extended Reporting Period**" (Dkt. No. 13-1, at 23; Dkt. No. 13-2, at 23) (emphasis in originals).

The 2015 and 2016 Policies contain the following Employment Practices Liability provision:

> The **Insurer** will pay on behalf of the **Insureds** all **Damages** and **Claims Expenses** for which the **Insureds** becomes legally obligated to pay by reason of a **Claim** first made against an **Insured** and reported to the **Insurer** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

(Dkt. No. 13-1, at 3; Dkt. No. 13-2, at 3) (emphasis in originals). A "claim" is defined in the 2015 and 2016 Policies in relevant part as: "a civil proceeding against any **Insured** seeking monetary **Damages** or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading," and "a civil, administrative[,] or regulatory proceeding against any **Insured** commenced by . . . the issuance of a notice of charge or formal investigative order, including without limitation any such proceeding by or in association with . . . the Equal Employment Opportunity Commission . . . ." (Dkt. No. 13-1, at 6; Dkt. No. 13-2, at 6) (emphasis in originals).

A Wrongful Employment Practice is defined by the 2015 and 2016 Policies in relevant part as a "wrongful dismissal, discharge[,] or termination," "[d]iscrimination," "[s]exual [h]arassment

or unlawful workplace harassment," "wrongful discipline," and "[r]etaliation" "of any past, present or prospective full-time, part-time, seasonal and temporary Employee or volunteer or leased Employee or applicant for employment of the Educational Institution" (Dkt. No. 13-1, at 16; Dkt. No. 13-2, at 16) (emphasis omitted).

The 2015 and 2016 Policies define "Wrongful Act" as "a **Wrongful Employment Practice** committed or attempted by the **Educational Institution** or by any **Insured Educator** acting solely in their capacity as such and on behalf of the **Educational Institution** and only to the extent the **Insured Educator** or other alleged wrongful actor was acting solely within the scope of their employment with or representation of the **Educational Institution**" (Dkt. No. 13-1, at 15; Dkt. No. 13-2, at 15) (emphasis in originals).

The 2015 and 2016 Policies define "Interrelated Wrongful Acts" as "[a]ll **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes" (Dkt. No. 13-1, at 11; Dkt. No. 13-2, at 11) (emphasis in originals).

Under the Limits of Liability sections of the 2015 and 2016 Policies, the Policies provide that "[a]ll **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed to be one **Claim**. Such **Claim** shall be deemed to be first made on the date the earliest of such **Claim** is first made, regardless of whether such date is before or during the **Policy Period**" (Dkt. No. 13-1, at 22; Dkt. No. 13-2, at 22) (emphasis in originals). The Policies also provide that "[a]ll **Damages** and all **Claims Expenses** resulting from a single **Claim** shall be deemed a single **Damage** and **Claims Expense** and shall be allocable to the policy in effect on the date the **Claim** is first made, regardless of whether such date is before or during the **Policy Period**" (Dkt. No. 13-1, at 22; Dkt. No. 13-2, at 22) (emphasis in originals).

Both Policies also contain a provision that states: "The titles and headings to the various parts, sections, subsections[,] and endorsements of the Policy are included solely for ease of reference. They do not in any way limit, expand[,] or otherwise affect the provisions of such parts, sections, subsections[,] or endorsements" (Dkt. No. 13-1, at 26; Dkt. No. 13-2, at 26) (emphasis omitted).

### C.     "Single Claim" Policy Language

The 2015 and 2016 Policies provide, in part, the following definition of "claim": "a civil, administrative[,] or regulatory proceeding against any Insured commenced by . . . the issuance of a notice of charge or formal investigative order, including without limitation any such proceeding by or in association with . . . the Equal Employment Opportunity Commission . . . ." (Dkt. No. 13-1, at 6; Dkt. No. 13-2, at 6) (emphasis omitted). The Court determines that, based on a plain language reading of the Policies, Ms. Alexander's December 1, 2015, EEOC charge against PBSD constitutes a claim under the Policies.

The 2015 and 2016 Policies also provide, in part, the following definition of "claim": "a civil proceeding against any Insured seeking monetary Damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading . . . ." (Dkt. No. 13-1, at 6; Dkt. No. 13-2, at 6) (emphasis omitted). Therefore, Ms. Alexander's subsequent lawsuit filed against PBSD on September 22, 2016, also constitutes a claim under the Policies.

The question for the Court is whether, based on the Policies' language, Ms. Alexander's EEOC charge and subsequent lawsuit constitute a single claim that was "first made" against PBSD during the 2015 Policy period.

ACE argues that the claims-made and reported policy requirements contained in the 2015 and 2016 Policies are unambiguous (Dkt. No. 15, at 14). ACE contends that Ms. Alexander's

December 1, 2015, EEOC charge and subsequent lawsuit filed on September 22, 2016, arise out of the same Wrongful Act and Interrelated Wrongful Acts and therefore comprise a single claim according to the 2015 and 2016 Policies (*Id.*, at 15). ACE asserts that the claim was "first made" when Ms. Alexander filed an EEOC charge on December 1, 2015 (*Id.*). ACE submits that, therefore, the 2015 Policy does not cover Ms. Alexander's claim because PBSD did not timely report the claim to ACE during the Policy period or within the 60-day grace reporting period (*Id.*, at 17). Instead, ACE submits, PBSD reported the claim to ACE on October 3, 2016 (*Id.*, at 19). ACE further asserts that the 2016 Policy also does not cover Ms. Alexander's claim because the claim was "first made" on December 15, 2015, which ACE submits is outside the 2016 Policy period (*Id.*).

PBSD responds that the Policies at issue include ambiguous language, which should preclude a grant of summary judgment in favor of ACE (Dkt. No. 24, at 4). PBSD argues that the "single claim" argument put forth by ACE is incorrect because the policy language upon which that argument relies is found in the "Limits of Liability" section of the Policy which is directed only at the ultimate amounts for which ACE could be liable, not as to whether coverage exists under the Policies (*Id.*, at 4-5). PBSD submits that the "one claim" language is notably absent from the insuring language and from the definition of "claim" (*Id.*, at 6). PBSD further submits that the definition for "Interrelated Wrongful Acts" likewise includes no discussion of the "single claim" language, nor is the "single claim" language found anywhere in the "Notices" section of the Policies (*Id.*, at 7). According to PBSD, ACE's proffered interpretation of the "single claim" provision in the Limits of Liability section would materially change the meaning of defined terms in the Policies, as well as the requirements under the Notices provision and Exclusions section (*Id.*).

In its reply, ACE asserts that PBSD points to no ambiguity in the Policies' language but rather that PBSD argues that the "one claim" language is found in the Limits of Liability section of the Policies and that this section is directed only at the amount of liability which the insurer will be required to pay, not at the issue of whether coverage exists (Dkt. No. 26, at 4-5). ACE argues that PBSD's view—that the only purpose of the "single claim" provision is to impose a per-claim limit of liability on multiple related claims—renders meaningless the requirement that the "claims made" date for multiple related claims is "the date the earliest of such Claim is first made, regardless of whether such date is before or during the Policy Period" (*Id.*, at 5). ACE submits that PBSD's argument has been rejected uniformly by courts (*Id.*).

The Court determines for the following reasons that the Policy language in the 2015 and 2016 Policies is unambiguous and that Ms. Alexander's December 1, 2015, EEOC charge and her subsequent lawsuit constitute a single claim that was "first made" against PBSD during the 2015 Policy period.

PBSD does not argue that any of the Policy language is ambiguous but instead submits that the Policy itself is ambiguous because the "single claim" language at issue is only made in reference to the ultimate amounts for which ACE will be liable, not as to whether coverage exists under the Policies (Dkt. No. 24, at 4). PBSD asserts that the relevant "one claim" language is "found in a Section VIII of the Policy, which is titled 'Limits of Liability'" (*Id.*, at 5). According to PBSD, "[i]t is clear that the 'Limits of Liability' section of the Policy is directed only at the amount of liability which the insurer will be required to pay, not at the issue of whether or not coverage exists" (*Id.*).

The Court determines that the single claim language at issue is not ambiguous. It states: "All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the

**Insureds** shall be deemed to be one **Claim**. Such **Claim** shall be deemed to be first made on the date the earliest of such **Claim** is first made, regardless of whether such date is before or during the **Policy Period**" (Dkt. No. 13-1, at 22; Dkt. No. 13-2, at 22) (emphasis in originals). That the provision exists in a section titled "Limits of Liability" does not render the application of the single claim language ambiguous. The 2015 and 2016 Policies contain a provision that states: "The titles and headings to the various parts, sections, subsections[,] and endorsements of the Policy are included solely for ease of reference. They do not in any way limit, expand[,] or otherwise affect the provisions of such parts, sections, subsections[,] or endorsements" (Dkt. No. 13-1, at 26; Dkt. No. 13-2, at 26) (emphasis omitted). Based on the plain language meaning of that provision, the Court concludes that the section heading "Limits of Liability" is not intended to "in any way limit, expand[,] or otherwise affect" the single claim language. The Court disagrees with PBSD that interpreting the Policy language in this way materially changes the meaning of defined terms in the policies, as well as the requirements under the Notices provision and the Exclusions section of the Policies (Dkt. No. 24, at 7). *See Tyson Foods, Inc. v. Archer*, 147 S.W.3d 681, 686 (Ark. 2004) ("A construction that neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions.").

Other courts have also concluded that similar "single claim" provisions are not limited to the amount of liability, even though the provisions are located in "Limit of Liability" sections of policies. In *Worthington Federal Bank v. Everest National Insurance Company*, 110 F.Supp.3d 1211 (N.D. Ala. June 4, 2015), the district court determined that a similar single-claim provision located in a section titled "Limit of Liability" "unambiguously does bear upon the scope of coverage, *i.e.*, what substantive claims are covered, not just upon calculating the limits of [the insurance company's] liability or retention amounts." *Worthington*, 110 F.Supp.3d at 1225. The

court explained that other "[c]ourts [had] construed such 'timing-of-claim' language to allow an insurer to deny coverage for a claim made during the policy period where the claim [was] sufficiently related to a covered claim that was 'first made . . . before . . . the Policy Period.'" *Id.* at 1225-26 (citing cases). The court continued, "Indeed, it is unclear what purpose language calling for relation back of one claim to another one 'first made' 'before the Policy Period' might have other than to exclude from coverage a claim that was itself made 'during the Policy Period.'" *Id.* at 1226 (citing *Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *14 (E.D.N.Y. Oct. 30, 2014); *Biochemics, Inc. v. Axis Reinsurance Co.*, 963 F.Supp.2d 64, 70-71 (D. Mass. 2013)). *See also Ciber, Inc. v. ACE American Insurance Co.*, 261 F.Supp.3d 1119, 1124 (D. Colo. June 9, 2017) (interpreting single claim ACE policy language to mean that, "if more than one claim involving interrelated wrongful acts is made against [the insured], the multiple claims are considered a single claim made on the date on which the earliest of the claims was made"), *appeal docketed*, No. 17-1243 (10th Cir. July 10, 2017).

PBSD relies on *Fiserv Solutions, Inc. v. Endurance American Specialty Insurance Company*, 2016 WL 8674661 (E.D. Wis. Sept. 30, 2016), to argue that the "single claim" language is not found in the section expressly labeled "Exclusions" and cannot be considered as such (Dkt. No. 24, at 8). The facts here are different from the facts in *Fiserv*. In *Fiserv*, the court determined that the relevant policy provided an "initial grant of coverage" because the underlying civil action for which the insured sought coverage was filed during the policy period, and the insurers did not argue that it was not timely reported to them. *Fiserv*, 2016 WL 8674661, at *18. The court's task, then, was to determine whether an exclusion in the policy precluded coverage and whether, if an exclusion contained an exception, the exception reinstated coverage. *Id.* at *17. The insurers contended that, under an exclusion clause in the policy, the underlying civil action was captured

by a potential claims notice given to another set of insurers during a previous and separate policy period and was therefore excluded from coverage under the current policy. *Id.* at *18. The court determined that, as a matter of law, the underlying civil action had not been captured by any previous notice Fiserv had given to the separate set of insurers during a previous and separate policy period because the underlying civil action alleged "different particulars of Fiserv's activity and potential liability than the [potential claims notice]" and because the underlying civil action was not "alleging, based upon, arising out of, or attributable to" the same Wrongful Act as any of the claims in Fiserv's actual-claims notice, also submitted to another set of insurers during a previous and separate policy period. *Id.* at *15, 18.

As to whether the underlying civil action was captured as "Interrelated Wrongful Acts" by the prior notice given by Fiserv to the other set of insurers during a previous and separate policy period, the court found that the insurers were "stretch[ing] the exclusion too far." *Id.* at *19. The court determined that, "[i]f '*any* fact, circumstance, situation, event, transaction, cause or series of' related items is interpreted as broadly as the insurers contended," coverage under the policy for certain services would be "illusory." *Id.* Acknowledging that other courts in other districts found definitions substantially identical to the Interrelated Wrongful Acts definition in the relevant policy to be unambiguous, the court disagreed, concluding that the Interrelated Wrongful Acts definition was ambiguous and interpreting the ambiguity against the insurers. *Id.* at *19-20. Still, explaining that the exclusion retained substantial meaning, the court determined that the Interrelated Wrongful Acts definition referred to wrongful acts that are the same or have a substantial common nexus or connection. *Id.* at *20. In analyzing whether the underlying civil action and the prior actual-claims notice were Interrelated Wrongful Acts as interpreted by the court, the court concluded that "[n]o

reasonable interpretation of the Interrelated Wrongful Acts provision would" find that they were. *Id.* at *21.

It was at this point that the court examined a provision in the policy at issue in that case that appears identical to the provision at issue in the instant case. *Id.* at *21-22. Citing another Eastern District of Wisconsin case, the court noted that the provision was part of the "policy setting forth limits of liability and retention. It is not labeled as an exclusion. Instead, it governs whether the insured must cover one or more retention amounts and is limited to a per-claim maximum limit of coverage." *Id.* at *22. The court declined to find that the provision provided a "second prior-litigation exclusion for the [insurers] to avoid liability" but determined that, "[i]f additional claims or litigation filed *after* the [underlying civil action] related back, then this provision might apply." *Id.*

Here, the Court determines that Ms. Alexander's December 1, 2015, EEOC charge and subsequent lawsuit are "Interrelated Wrongful Acts," as defined by the 2015 and 2016 Policies: "[a]ll Wrongful Acts that have as a common nexus any fact, circumstance, situation, event, transaction, cause of series of related facts, circumstances, situations, events, transactions[,] or causes" (Dkt. No. 13-1, at 11; Dkt. No. 13-2, at 11). It is undisputed that Ms. Alexander's December 1, 2015, EEOC charge and subsequent lawsuit are "related." PBSD sent an email to ACE on October 3, 2016, explaining that there "was a related EEOC claim and investigation by the Arkansas Department of Education Professional Licensure Standards Board, which dismissed the allegations" (Dkt. No. 13-9, at 6). More precisely, Ms. Alexander's December 1, 2015, EEOC charge alleges: "I was hired September 19, 2014, as a [m]ath [l]ab [c]oordinator/[m]ath [t]eacher. I was identified for [reduction in force] in April 2015. I filed a sexual harassment complaint against my [p]rincipal in June 2015. I was not hired for the next school year and my employer hired

uncertified and lesser-qualified math teachers in August 2015. I was told that I would never be rehired for making false allegations. I believe I was not rehired in retaliation for filing sexual harassment allegations in violation of Title VII of the Civil Rights Act of 1964, as amended" (Dkt. No. 13-4, at 1; Dkt. No. 25, at 9-10). In response to the EEOC charge, PBSD submitted a mediation statement to the EEOC on January 21, 2016, and it submitted a position statement to the EEOC on January 28, 2016 (Dkt. No. 13-5; Dkt. No. 13-6).

Ms. Alexander's subsequent lawsuit also arises out of the same allegations that Michael Nellums, a principal at PBSD, purportedly sexually harassed her and retaliated against her after she rejected his advances (Dkt. No. 13-3). *See City of Maplewood, Mo. v. Northland Cas. Co.*, 2012 WL 3578695 (E.D. Mo. Aug. 20, 2012) (concluding that an EEOC charge and a civil lawsuit were sufficiently related to constitute a single claim despite plaintiff making allegations in civil lawsuit that she did not include in original EEOC charge); *Scottsdale Indemnity Company v. Convercent, Inc.*, 2017 WL 5446093, at *5, 9 (D. Colo. Nov. 14, 2017) (finding that a pre-suit letter, an EEOC charge, and a civil lawsuit "ar[o]se out of the same wrongful act[s]," namely, the circumstances surrounding the termination of employment, and constituted a single claim that had to be reported in a timely manner according to when the claim was first made in the pre-suit letter). PBSD in its filings does not dispute that Ms. Alexander's EEOC charge and subsequent lawsuit are based on the same alleged facts (Dkt. Nos. 25, at 8-11).

### D.    Coverage Under The 2015 Policy

Having determined that Ms. Alexander's December 1, 2015, EEOC charge and subsequent lawsuit against PBSD constitute a single claim under the Policies, the next question for the Court is whether there is coverage for the claim under the 2015 Policy. The Insuring Agreement for the Employment Practices Liability coverage section in the 2015 Policy provides that "[t]he Insurer

will pay on behalf of the Insureds all Damages and Claims Expenses for which the Insured[] becomes legally obligated to pay by reason of a Claim first made against an Insured and reported to the Insurer during the Policy Period . . . " (Dkt. No. 13-1, at 3). Under Arkansas law, a "'claims made and reported policy' can only be triggered if the claim is made in writing and given to the insurer during the policy period." *Homebank of AR v. Kansas Bankers Sur. Co.*, 2008 WL 2704670, at *5 (E.D. Ark. July 7, 2008) (citing *Campbell & Co. v. Utica Mut. Ins. Co.*, 820 S.W.2d 284 (Ark. 1991)).

Under the 2015 Policy, PBSD had until April 1, 2016, when the extended 60-day grace reporting period following the policy expiration date expired, to report Ms. Alexander's December 1, 2015, EEOC charge to ACE. PBSD first reported Ms. Alexander's claim (her lawsuit) to ACE on October 3, 2016 (Dkt. No. 13-9, at 6; Dkt. No. 25, at 12). PBSD's insurance agent attached to the loss notice a copy of the lawsuit and an email from PBSD's counsel (Dkt. No. 13-9; Dkt. No. 25, at 12). The email states that "[t]here was a related EEOC claim and investigation by the Arkansas Department of Education Professional Licensure Standards Board, which dismissed the allegations. The EEOC issued a right to sue letter on June 24, 2016" (Dkt. No. 13-9, at 6). ACE acknowledged receipt of Ms. Alexander's claim and sent an email to PBSD's superintendent, Dr. Michael Robinson, on October 20, 2016 (Dkt. No. 13-10).

ACE requested that PBSD provide "a copy of the EEOC charge filed against Ms. Alexander," along with "any documents relating to the [June 2015] grievance process" (*Id.*). PBSD provided the EEOC charge to ACE on November 22, 2017 (Dkt. No. 13-12, at 2-3). PBSD denies that ACE was not already in possession of certain information regarding the EEOC charge which could have led it to make its coverage decision earlier; PBSD submits that Cody Kees,

attorney for PBSD in Ms. Alexander's lawsuit, provided ACE's adjuster Whit Kelly with the information on January 24, 2017 (Dkt. No. 24, at 14; Dkt. No. 25, at 14).

Having determined that Ms. Alexander's December 1, 2015, EEOC charge and subsequent lawsuit against PBSD constitute a single claim under the Policies, and because PBSD did not report the claim to ACE until October 3, 2016, six months after the 60-day grace reporting period after the 2015 Policy expired, the Court determines that ACE is entitled to summary judgment as a matter of law for any coverage sought under the 2015 Policy.

### E.  Coverage Under The 2016 Policy

The Court next analyzes whether there is coverage for the claim under the 2016 Policy. The Insuring Agreement for the Employment Practices Liability coverage section in the 2016 Policy provides that "[t]he Insurer will pay on behalf of the Insureds all Damages and Claims Expenses for which the Insured becomes [sic] legally obligated to pay by reason of a Claim first made against an Insured and reported to the Insurer during the Policy Period . . . " (Dkt. No. 13-2, at 3).  Having determined that Ms. Alexander's December 1, 2015, EEOC charge and subsequent lawsuit against PBSD constitute a single claim under the Policies, the claim was first made against PBSD on December 1, 2015, before the 2016 Policy took effect.  The Court determines that ACE is entitled to summary judgment as a matter of law for any coverage sought under the 2016 Policy.

### F.  Waiver And Estoppel

PBSD argues in the alternative that PBSD should be precluded from denying coverage because of the doctrines of waiver and estoppel (Dkt. No. 24, at 11).  PBSD acknowledges that ACE's October 25, 2016, letter "purports to 'reserve[] all rights with regard to the above referenced provisions, as well as all other rights, remedies and defenses under the Policy'" but argues that ACE did not send its denial of coverage letter until February 14, 2018 (*Id.*, at 12-13).  PBSD

submits that ACE seemingly ignored the issues related to the EEOC charge for nearly a year (*Id.*, at 13). According to PBSD, ACE's own oversight in pursuing documents related to the EEOC charge for more than a year, in conjunction with its course of conduct in accepting this matter for a significant period of time, reasonably led PBSD to believe that coverage existed in this matter (*Id.*, at 14). PBSD asserts that ACE had knowledge of the date when the EEOC charge was filed at least by the time it received a January 24, 2017, litigation report provided to Mr. Kelly by Mr. Kees (*Id.*). PBSD submits that, instead of raising the coverage issues then, ACE delayed in addressing the issues again until November 2017, leading PBSD to believe coverage existed in this matter (*Id.*, at 15).

PBSD argues that ACE further demonstrated that it had waived its coverage position by hiring separate counsel to represent Mr. Nellums, in his individual capacity, in the action brought by Ms. Alexander (*Id.*). PBSD submits an affidavit from Khayyam Eddings indicating that ACE consented to his hiring to represent Mr. Nellums in support of this argument (Dkt. No. 23-2).

PBSD contends that it was prejudiced by ACE's actions because PBSD's entire litigation strategy was based on the belief that there was coverage related to Ms. Alexander's lawsuit (Dkt. No. 24, at 15). PBSD argues that, had it known earlier in the litigation that ACE was going to raise coverage issues again at a late stage in the litigation, PBSD could have pursued a strategy to attempt to settle the underlying case at an earlier stage (*Id.*, at 16).

ACE responds that PBSD faults ACE for delaying its coverage denial, a delay which ACE asserts PBSD created itself by failing to heed ACE's first two requests for PBSD to provide copies of the EEOC filings (Dkt. No. 26, at 10). ACE asserts that it was not able to confirm that PBSD actually received notice of Ms. Alexander's EEOC charge prior to the February 1, 2016, Policy inception date for the 2016 Policy until defense counsel provided ACE with a complete copy of

the EEOC filings (*Id.*, at 11-12). Therefore, ACE submits that, until its follow up request to PBSD for the January 2016 EEOC filings in November 2017, ACE did not have confirmation that Ms. Alexander's claim was "first made" during the 2015 Policy Period (*Id.*, at 12).

ACE further submits that, because the basis for ACE's coverage denial does not involve a forfeiture provision, ACE cannot be found to have waived, or to be estopped from asserting, that coverage defense (*Id.*, at 11). With respect to ACE's appointing of separate counsel to represent Mr. Nellums, ACE submits that it did so in order to avoid a potential conflict of interest between PBSD and Mr. Nellums (*Id.*, at 12). ACE contends that this action has no bearing on PBSD's failure to comply with the claims-made and reported requirements of the Policies (*Id.*). ACE also asserts that PBSD has not submitted any evidence to support its allegation that it would have changed its litigation strategy had ACE denied the claim sooner (*Id.*, at 13). ACE contends that, even if such evidence were available, estoppel cannot be used to create coverage (*Id.*).

In its supplement to response to motion for summary judgment, PBSD contends that the Federal Rule of Civil Procedure 30(b)(6) deposition of Mr. Kelly is especially useful in supporting its arguments that ACE should be precluded from denying coverage because of the doctrines of waiver and estoppel (Dkt. No. 38, at 1). In the supplement, PBSD asserts that Mr. Kelly's testimony confirms that, after ACE's October 25, 2016, letter purporting to reserve all rights under the Policies, there was no follow up on the part of ACE to obtain the EEOC documents for nearly a year (*Id.*, at 2). PBSD argues that Mr. Kelly's emails indicating that he "noticed" ACE never received relevant documents and "was reminded" that ACE had still not received relevant previously requested information, coupled with the delay in time before ACE denied coverage, demonstrates a lack of diligence on the part of ACE and supports PBSD's waiver and estoppel arguments (*Id.*, at 2-3). According to PBSD, Mr. Kelly's testimony confirms that Mr. Kelly

received Mr. Kees' preliminary litigation report on January 24, 2017, but ACE delayed in addressing coverage issues until November 2017, leading PBSD to believe coverage existed in this matter during the intervening time (*Id.*, at 3). PBSD also submits that Mr. Kelly's deposition supports PBSD's contention that ACE waived its coverage position by hiring separate counsel to represent Mr. Nellums and by participating in the strategic developments of the case (*Id.*, at 3-4).

On October 25, 2016, ACE sent to PBSD a letter which included a "request for additional information" regarding Ms. Alexander's EEOC charge and requesting a copy of that charge as well as a "copy of any written demands, complaints, grievances, *etc.* from [Ms.] Alexander received by the Insured prior to the EEOC charge and lawsuit" (Dkt. No. 13-11, at 1-2). ACE "reserve[d] the right to amend and/or deny coverage based upon review of this information" (*Id.*, at 2). ACE explained further:

> We currently know very little about this claim aside from what is alleged in the lawsuit filed by [Ms.] Alexander. As this matter progresses, however, additional facts and/or defense may be developed which may have an impact on existing coverage issues. Should this occur, please notify [ACE] immediately and we will forward a supplemental letter advising of any change in our position, if necessary. In the meantime, please note that coverage is potentially afforded for this matter, subject to our continuing analysis and the reservations contained herein.

(*Id.*). In the conclusion of the letter, ACE again "reserve[d] all rights with regard to the above referenced provisions, as well as all other rights, remedies[,] and defenses under the Policy, at law, and in equity" and stated that these "reservations include, but are not limited to, the right to withdraw the defense provided in this matter and the right to amend this letter to address additional coverage issues as they may arise, based upon the Policy and/or any additional facts that may come to [ACE's] attention" (*Id.*, at 3). Finally, ACE explained that "[n]othing contained in this letter, and no action on our part in investigating these matters, should be construed as an admission of coverage or as a waiver of any right, remedy, or defense that may be available to [ACE]" (*Id.*).

*See Bull v. Federated Mutual Insurance Company*, 338 F.Supp.3d 958 (E.D. Ark. Sept. 7, 2018) (finding that the insurance company did not waive its right to contest coverage when it settled claims made against plaintiff in the underlying litigation where it sent two reservation of rights letters).

ACE sent its reservation of rights letter to PBSD on October 25, 2016, prior to the hiring of Mr. Eddings as counsel for Mr. Nellums (Dkt. No. 23-2, at 4-8). *See Kinsale Insurance Co. v. Advanced Services, Inc.*, 2014 WL 11290895, at *6 (S.D. Miss. Sept. 29, 2014) (concluding that the insurance company did not waive its right to assert its noncoverage defenses despite retaining counsel before sending a reservation of rights letter because the insurance company did not have knowledge of its potential coverage defenses when it initially provided the insured with counsel). Further, the record evidence before the Court demonstrates that Mr. Nellums originally requested separate counsel on November 28, 2016, to "avert a potential conflict down the road" and suggested Mr. Eddings as his separate counsel (Dkt. No. 23-2, at 5-6). Missy Duke, whom Mr. Kees initially recommended to represent Mr. Nellums, then indicated by email that Mr. Kelly "ha[d] no problem with [Mr. Eddings] handling this matter for [Mr. Nellums]." (*Id.*, at 5; Dkt. No. 38-1, at 31-32). In the light of ACE's reservation of rights letter, the Court will not conclude that this arrangement for hiring separate counsel for Mr. Nellums based on a conflict of interest constitutes a waiver by ACE.

PBSD asserts that ACE had knowledge of the date when the EEOC charge was filed at least by the time it received a January 24, 2017, litigation report provided to Mr. Kelly by Mr. Kees (*Id.*; Dkt. No. 23-1, at 12). However, PBSD does not dispute that it did not provide a complete copy of the EEOC filings to ACE until ACE's follow up request in November 2017. ACE asserts that it was not until it received the complete EEOC file that it was able to confirm

that PBSD actually received notice of Ms. Alexander's EEOC charge prior to the February 1, 2016, Policy inception date for the 2016 Policy (*Id.*, at 11-12).  According to record emails and Mr. Kelly's deposition testimony, ACE requested the relevant documents on October 20, 2016; ACE followed up the request in the reservation of rights letter on October 25, 2016; again requested the documents on November 22, 2017; and again on December 18, 2017 (Dkt. No. 23-1, at 41; Dkt. No. 38-1, at 22-24).  On November 22, 2017, ACE received a copy of the EEOC charge (Dkt. No. 25, at 14).  On January 9, 2018, Mr. Kelly "received all of the EEOC documentation that [ACE] needed" (Dkt. No. 38-1, at 25).  ACE issued a supplemental coverage position on February 14, 2018, denying coverage to PBSD under the Policies (Dkt. No. 13-13).  The Court will not find under these circumstances that ACE unreasonably delayed its coverage determination.

Ms. Alexander's claim is not covered under either the 2015 or the 2016 Policy.  Arkansas law does not permit waiver and estoppel to broaden the scope of coverage afforded by a policy.  *J-McDaniel Const. Co. v. Mid-Continent Cas. Co.*, 761 F.3d 916, 919 (8th Cir. 2014).  The Court will not deny ACE's motion for summary judgment on this basis.

**IV.    Conclusion**

For these reasons, the Court grants ACE's motion for summary judgment (Dkt. No. 13).  PBSD's claims are hereby dismissed with prejudice.  Judgment will be entered accordingly.

It is so ordered this 12th day of July, 2019.

Kristine G. Baker
United States District Judge